# EXHIBIT 1-A



IN THE CIRCUIT COURT FOR THE CITY OF ST. LOUIS
STATE OF MISSOURI

BNSF Railway Company,                        )
                                             )
Plaintiff,                                   )
                                             )
vs.                                          )  Cause No. _____
                                             )
The Doe Run Resources Corporation,           )
                                             )
SERVE:  Registered Agent                     )  Division No. 1
        CT Corporation System                )
        120 South Central Ave.               )
        Clayton, MO 63105                     )
                                             )
Fluor Corporation,                           )
        The Corporation                      )
SERVE:  Managing Agent                       )
        Fluor Corporation                    )
        3333 Michelson Dr., #351M            )
        Irvine, CA 92730                      )
                                             )
Doe Run Investment Holding Corporation,      )
                                             )
SERVE:  Managing Agent                       )
        Doe Run Investment Holding Corporation )
        4 North Fourth Street                )
        Richmond, VA 23219                    )
                                             )
DR Acquisition Corp.,                        )
                                             )
SERVE:  Registered Agent                     )
        CT Corporation System                )
        120 South Central Ave.               )
        Clayton, MO 63105                     )
                                             )
The Renco Group, Inc.,                       )
                                             )
SERVE:  Managing Agent                       )
        The Renco Group, Inc.                )
        30 Rockefeller Plaza                 )
        New York, NY 10112                    )
                                             )

2415236

IN THE CIRCUIT COURT FOR THE CITY OF ST. LOUIS
STATE OF MISSOURI

| | | |
|---|---|---|
| BNSF Railway Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Cause No. ___052-01585___ |
| vs. | ) | |
| | ) | |
| The Doe Run Resources Corporation, | ) | |
| | ) | |
| SERVE:  Registered Agent | ) | Division No. 1 |
|         CT Corporation System | ) | |
|         120 South Central Ave. | ) | |
|         Clayton, MO 63105 | ) | |
| | ) | |
| Fluor Corporation, | ) | |
| | ) | |
| SERVE:  Managing Agent | ) | |
|         Fluor Corporation | ) | |
|         3333 Michelson Dr., #551M | ) | |
|         Irvine, CA 92730 | ) | |
| | ) | |
| Doe Run Investment Holding Corporation, | ) | |
| | ) | |
| SERVE:  Managing Agent | ) | |
|         Doe Run Investment Holding Corporation | ) | |
|         4 North Fourth Street | ) | |
|         Richmond, VA 23219 | ) | |
| | ) | |
| DR Acquisition Corp., | ) | |
| | ) | |
| SERVE:  Registered Agent | ) | |
|         CT Corporation System | ) | |
|         120 South Central Ave. | ) | |
|         Clayton, MO 63105 | ) | |
| | ) | |
| The Renco Group, Inc., | ) | |
| | ) | |
| SERVE:  Managing Agent | ) | |
|         The Renco Group, Inc. | ) | |
|         30 Rockefeller Plaza | ) | |
|         New York, NY 10112 | ) | |
| | ) | |

2415236

A.T. Massey Coal Company,                    )
                                             )
SERVE:  Registered Agent                     )
        Roger L. Nicholsan                   )
        4 North Fourth Street                )
        Richmond, VA 23219                   )
                                             )
Homestake Lead Company of Missouri,          )
                                             )
SERVE:  Managing Agent                       )
        Homestake Lead Company               )
        650 California Street, 11th Floor     )
        San Francisco, CA 94108              )
                                             )
Cyprus Amax Minerals Company,                )
                                             )
SERVE:  Registered Agent                     )
        The Corporation Trust Company        )
        1209 Orange Street                   )
        Wilmington, DE 19801                 )
                                             )
and                                          )
                                             )
Missouri Lead Smelting Company,              )
                                             )
SERVE:  Registered Agent                     )
        The Corporation Trust Company        )
        1209 Orange Street                   )
        Wilmington, DE 19801                 )
                                             )
        Defendants.                          )


## PLAINTIFF'S PETITION

COMES NOW Plaintiff BNSF Railway Company ("BNSF") and for its Petition

against Defendants The Doe Run Resources Corporation, Fluor Corporation, Doe Run

Investment Holding Corporation, DR Acquisition Corp., The Renco Group, Inc., A.T.

Massey Coal Company, Homestake Lead Company of Missouri, Cyprus Amax Minerals

Company, and Missouri Lead Smelting Company states as follows:

### Allegations Common to All Counts

### The Parties

1.     BNSF Railway Company ("BNSF") is a corporation organized and existing under the laws of the state of Delaware.

2.     BNSF is the successor to The Burlington Northern and Santa Fe Railway Company, which is the successor to Burlington Northern Railroad Company, which is the successor to The St. Louis-San Francisco Railway Company ("Frisco").

3.     As hereinafter alleged in greater detail, some of the events giving rise to the causes of action alleged in this Petition arose in the City of St. Louis, Missouri.

4.     Defendant The Doe Run Resources Corporation is, and at all times relevant herein was, a corporation organized and existing under the laws of the state of New York with its principal place of business in St. Louis County, Missouri.

5.     Defendant Fluor Corporation is, and at all times relevant herein was, a corporation organized and existing under the laws of the state of Delaware.

6.     Defendant Doe Run Investment Holding Corporation is, and at all times relevant herein was, a corporation organized and existing under the laws of the state of Delaware.

7.     Defendant DR Acquisition Corp. is, and at all times relevant herein was, a corporation organized and existing under the laws of the state of Missouri.

8.     Defendant The Renco Group, Inc., is, and at all times relevant herein was, a corporation organized and existing under the laws of the state of New York.

9.     Defendant A.T. Massey Coal Company is, and at all times relevant herein was, a corporation organized and existing under the laws of the state of Virginia.

10.    Defendant Homestake Lead Company of Missouri is, and at all times relevant herein was, a corporation organized and existing under the laws of the state of California.

11.    Defendant Cyprus Amax Minerals Company is, and at all times relevant herein was, a corporation organized and existing under the laws of the state of Arizona.

12.    Defendant Missouri Lead Smelting Company is, and at all times relevant herein was, a corporation organized and existing under the laws of the state of Delaware.

## Mining, Milling And Smelting Operations On The Lead Line

13.    In 1967, St. Joseph Lead Company owned a lead smelter in Herculaneum, Missouri (hereinafter referred to as "Herculaneum Smelter").

14.    St. Joseph Lead Company and its successors continued to own and operate the Herculaneum Smelter from 1967 to the present.

15.    In 1967, St. Joseph Lead Company owned and operated lead mines in Crawford County, Washington County, Iron County, and Reynolds County, Missouri.

16.    St. Joseph Lead Company and its successors continued to own and operate these mines and others in the same vicinity from 1967 to the present.

17.    In 1967, St. Joseph Lead Company owned and operated mills in Iron County and Reynolds County, Missouri to process lead ore into a purified and concentrated form known as lead ore concentrate ("LOC"), including a mill near Viburnum, Missouri known as Viburnum Mine/Mill and a mill near Fletcher, Missouri known as Fletcher Mine/Mill.

18.    Lead ore mined from St. Joseph Lead Company's mines in Crawford, Washington, and Iron counties was processed at Viburnum Mine/Mill.

19.    St. Joseph Lead Company and its successors continued to own and operate Viburnum Mine/Mill from 1967 to the present.

20.    Lead ore mined from St. Joseph Lead Company's mines in Reynolds County was processed at Fletcher Mine/Mill.

21.    St. Joseph Lead Company and its successors continued to own and operate Fletcher Mine/Mill from 1967 to the present.

22.     In 1967, Homestake Lead Company of Missouri and Amax Lead Company of Missouri, operating as partnership, opened and began operating a lead mine and mill near Buick, Missouri in Iron County known as Buick Mine/Mill.

23.    Homestake Lead Company of Missouri and Amax Lead Company of Missouri and their successors continued to operate Buick Mine/Mill from 1967 to the present.

24.    In 1967 Homestake Smelting Company, Homestake Lead Company of Missouri, Missouri Lead Smelting Company, and Amax Lead Company of Missouri, operating as a partnership known as Amax-Homestake Lead Tollers, opened and began operating a lead smelter near Boss, Missouri in Iron County known as Buick Smelter.

25.    Homestake Smelting Company, Homestake Lead Company of Missouri, Missouri Lead Smelting Company, and Amax Lead Company of Missouri and their successors continued to operate Buick smelter from 1967 to the present.

26.    In 1967 BNSF's predecessor, The St. Louis San Francisco Railway Company ("Frisco"), opened a branch line from Cuba, Missouri, in Crawford County, to a terminus just south of Buick Mine/Mill in Iron County, Missouri.

27.    Said branch line is known as the "Lead Line" and runs south from Cuba through Steeleville to Viburnum and then on to Buick.

28.    In 1967 Frisco opened an industry sidetrack from the Lead Line to serve Viburnum Mine/Mill.

29.    In 1967 Frisco opened an industry sidetrack from the Lead Line to serve Buick Mine/Mill.

30.    In 1967 St. Joseph Lead Company began operating an overhead crane along the tracks at the southernmost terminus of the Lead Line to allow railcars to be loaded with LOC brought by truck from Fletcher Mine/Mill.

31.    The overhead crane at the southernmost terminus of the Lead Line is known as "Fletcher Transload."

32.    St. Joseph Lead Company and its successors continued to own and operate Fletcher Transload from 1967 to 1999.

33.    In 1967, Frisco opened an industry sidetrack from the Lead Line to serve the LOC unloading station at Buick Smelter.

34.    In 1990, BNSF's predecessor, the Burlington Northern Railroad Company ("BN"), opened an industry sidetrack from the Lead Line to serve additional buildings at the Buick Smelter known as the Buick Recycling Center.

### Ownership, Control and Succession Of Lead Mining Companies

35.    From 1967 to 1986, American Metals Climax and its successors owned Amax Lead Company of Missouri and operated said company as their agent.

36.    From 1967 to 1986, American Metals Climax and its successors owned Missouri Lead Smelting Company and operated said company as their agent.

37.     From 1967 to 1986, American Metals Climax and its successors and Amax Lead Company of Missouri, Missouri Lead Smelting Company, Homestake Lead Smelting Company, and Homestake Lead Company of Missouri were partners in the ownership and/or operation of Buick Mine/Mill and Buick Smelter.

38.     In 1970, St. Joseph Lead Company changed its name to St. Joe Minerals Corp.

39.     In 1974, American Minerals Climax, Inc. changed its name to Amax, Inc.

40.     In 1974, St. Joe Minerals Corp. purchased A.T. Massey Coal Mining Company and held it as a subsidiary.

41.     From 1974 to 1986, St. Joe Minerals Corp. operated A.T. Massey Coal Company as its agent.

42.     From 1974 to 1986, St Joe Minerals Corp. and its successors and A.T. Massey Coal Mining Company were partners in the ownership and/or operation of Herculaneum Smelter, Viburnum Mine/Mill, and Fletcher Transload.

43.     In 1981, Fluor Corporation purchased St. Joe Minerals Corp. and held it as a subsidiary.

44.     From 1981 to 1994, Fluor Corporation and its successors operated St. Joe Minerals Corp. as their agent.

45.     From 1981 to 1994, Fluor Corporation, St. Joe Minerals Corp. and A.T. Massey Coal Company were partners in the ownership and/or operation of Herculaneum Smelter, Viburnum Mine/Mill, and Fletcher Transload.

46.     In 1986, Homestake Smelting Company merged into Defendant Homestake Lead Company of Missouri.

47.    In 1986, Amax, Inc. directed its agents Missouri Lead Smelting Company and Amax Lead Company of Missouri to sell their interests in Amax-Homestake Lead Tollers, Buick Mine/Mill, and Buick Smelter to Homestake Lead Company of Missouri and to transfer the net sale proceeds to Amax, Inc.

48.    In May 1986, pursuant to directions from their principal and master Amax, Inc., Missouri Lead Smelting Company and Amax Lead Company of Missouri sold their interests in Amax-Homestake Lead Tollers, Buick Mine/Mill, and Buick Smelter to Homestake Lead Company of Missouri and transferred the net sale proceeds to Amax, Inc.

49.    In November 1986, St. Joe Minerals Corp. and Homestake Lead Company of Missouri formed a general partnership called The Doe Run Company to jointly own and operate Herculaneum Smelter, Viburnum Mine/Mill, Buick Mine/Mill, Buick Smelter, and Fletcher Transload.

50.    From November 1986 to the present, The Doe Run Company and its successors owned and operated Herculaneum Smelter, Viburnum Mine/Mill, Buick Mine/Mill, Buick Smelter, and Fletcher Transload.

51.    In 1987, Fluor Corporation reorganized its business and made A.T. Massey Coal Company a subsidiary of Fluor Corporation and thereafter continued to operate A.T. Massey Coal Company as its agent.

52.    In October 1988, St. Joe Minerals Corp. assigned a portion of its interests and liabilities in The Doe Run Company to A.T. Massey Coal Company.

53.    From 1986 to 1990, Fluor Corporation, A.T. Massey Coal Company, St. Joe Minerals Corp., and Homestake Lead Company of Missouri were partners in The Doe Run Company.

54.    In April 1989, Fluor Corporation organized Doe Run Investment Holding Corporation as a subsidiary of Fluor Corporation and thereafter operated Doe Run Investment Holding Corporation as its agent.

55.    In April 1989, St. Joe Minerals Corp. and A.T. Massey Coal Company assigned a portion of their respective interests and liabilities in The Doe Run Company to Doe Run Investment Holding Corporation.

56.    From 1989 to 1990, Fluor Corporation, A.T. Massey Coal Company, St. Joe Minerals Corp., Doe Run Investment Holding Corporation, and Homestake Lead Company of Missouri were partners in The Doe Run Company.

57.    In 1990, Fluor Corporation organized Leadco Investments, Inc. as a subsidiary of Fluor Corporation and thereafter operated Leadco Investments, Inc. as its agent.

58.    In May 1990, Homestake Lead Company of Missouri assigned all or a portion of its interest in The Doe Run Company to Fluor Corporation.

59.    In May 1990, Homestake Lead Company of Missouri assigned all or a portion of its interest in the Doe Run Company to Leadco Investments, Inc.

60.    From 1990 to 1991, Fluor Corporation, A.T. Massey Coal Company, St. Joe Minerals Corp., and Doe Run Investment Holding Corporation were partners in The Doe Run Company.

61.    In 1991, Fluor Corporation assigned all or part of its interests and liabilities in The Doe Run Company to Leadco Investments, Inc.

62.    From 1991 to April 1994, Fluor Corporation, A.T. Massey Coal Company, Leadco Investments, Inc., Doe Run Investment Holding Corporation, and St. Joe Minerals Corp. were partners in The Doe Run Company.

63.    In 1992, Amax, Inc. merged into Defendant Cyprus Amax Minerals Company.

64.    On January 24, 1994, Leadco Investments, Inc. merged into St. Joe Minerals Corp.

65.    In 1994, The Renco Group, Inc., organized DR Acquisition Corp. as a subsidiary of The Renco Group, Inc. and thereafter operated DR Acquisition Corp. as its agent.

66.    On March 28, 1994, Fluor and St. Joe Minerals Corp. sold their respective interests and liabilities in The Doe Run Company partnership to DR Acquisition Corp.

67.    On April 4, 1994, DR Acquisition Corp. assigned its interests and liabilities in The Doe Run Company to St. Joe Minerals Corp. and changed the name of St. Joe Minerals Corp. to The Doe Run Resources Corporation.

68.    On April 11, 1994, Doe Run Investment Holding Corporation assigned its interests and liabilities in The Doe Run Company to The Doe Run Resources Corporation.

69.    From April 11, 1994, to the present, A.T. Massey Coal Company, DR Acquisition Corp., The Renco Group, Inc., and The Doe Run Resources Corporation were partners in The Doe Run Company.

70.    From 1986 to the present, The Doe Run Company owned and operated Herculaneum Smelter, Viburnum Mine/Mill, Buick Mine/Mill, Buick Smelter, and Buick Transload.

71.    The Doe Run Resources Corporation is the successor to the interests and liabilities of St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Amax, Inc., Fluor Corporation, A.T. Massey Coal Company, Doe Run Investment Holding Corporation, Leadco Investments, Inc., DR Acquisition Corp., and The Doe Run Company with respect to the ownership and operation of lead mining, milling and smelting operations at Herculaneum Smelter, Viburnum Mine/Mill, Buick Mine/Mill, Buick Smelter, and Fletcher Transload from 1967 to the present.

72.    Fluor Corporation is the successor to the interests and liabilities of St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Amax, Inc., A.T. Massey Coal Company, Doe Run Investment Holding Corporation, Leadco Investments, Inc. and The Doe Run Company with respect to the ownership and operation of lead mining, milling and smelting operations at Herculaneum Smelter, Viburnum Mine/Mill, Buick Mine/Mill, Buick Smelter, and Fletcher Transload from 1967 to 1994.

73.    Doe Run Investment Holding Corporation is the successor to the interests and liabilities of St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax-Homestake Lead

Tollers, Amax, Inc., and The Doe Run Company with respect to the ownership and operation of lead mining, milling and smelting operations at Herculaneum Smelter, Viburnum Mine/Mill, Buick Mine/Mill, Buick Smelter, and Fletcher Transload from 1967 to 1994.

74.     DR Acquisition Corp. is the successor to the interests and liabilities of St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Amax, Inc., A.T. Massey Coal Company, Doe Run Investment Holding Corporation, Leadco Investments, Inc., and The Doe Run Company with respect to the ownership and operation of lead mining, milling and smelting operations at Herculaneum Smelter, Viburnum Mine/Mill, Buick Mine/Mill, Buick Smelter, and Fletcher Transload from 1967 to 1994.

75.     The Renco Group, Inc. is the successor to the interests and liabilities of St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Amax, Inc., A.T. Massey Coal Company, Doe Run Investment Holding Corporation, Leadco Investments, Inc., DR Acquisition Corp., The Renco Group, Inc., and The Doe Run Company with respect to the ownership and operation of lead mining, milling and smelting operations at Herculaneum Smelter, Viburnum Mine/Mill, Buick Mine/Mill, Buick Smelter, and Fletcher Transload from 1967 to 1994.

76.     Homestake Lead Company of Missouri is the successor to the interests and liabilities of Homestake Lead Smelting Company, Amax Lead Company of Missouri,

Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Amax, Inc., St. Joe Minerals Corp., and The Doe Run Company with respect to the ownership and operation of lead mining, milling and smelting operations at Herculaneum Smelter, Viburnum Mine/Mill, Buick Mine/Mill, Buick Smelter, and Fletcher Transload from 1967 to 1990.

77.     Missouri Lead Mining Company is the successor to the interests and liabilities of Amax Lead Company of Missouri, Amax-Homestake Lead Tollers, and Amax, Inc. with respect to the ownership and operation of lead mining, milling and smelting operations at Buick Mine/Mill and Buick Smelter from 1967 to 1990.

78.     Cyprus Amax Minerals Company is the successor to the interests and liabilities of Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Tollers, and Amax, Inc. with respect to the ownership and operation of the lead mining, milling and smelting operations at Buick Mine/Mill and Buick Smelter from 1967 to 1986.

### Viburnum Mine/Mill Sidetrack Agreement

79.     In conjunction with the opening of the industry sidetrack to serve Viburnum Mine/Mill, Frisco and St. Joseph Lead Company entered into an industry sidetrack agreement dated September 18, 1967 governing the construction, maintenance, operation and ownership of said sidetrack (hereinafter referred to as "1967 Viburnum Mine/Mill Sidetrack Agreement"). A copy of the 1967 Viburnum Mine/Mill Sidetrack Agreement is attached hereto as Exhibit A.

80.     The 1967 Viburnum Mine/Mill Sidetrack Agreement was supplemented by agreement dated September 27, 1974, between Frisco and St. Joseph Lead Company, which provided for a 465-foot extension of the industry sidetrack serving Viburnum

Mine/Mill (hereinafter referred to as "1974 Supplement to 1967 Viburnum Mine/Mill Sidetrack Agreement"). The terms and conditions of the original agreement applied to the supplemental agreement unless otherwise provided for in the supplemental agreement. A copy of said supplemental agreement is attached hereto as Exhibit B.

81.    The 1967 Viburnum Mine/Mill Sidetrack Agreement was supplemented again by agreement dated February 7, 1975, between Frisco and St. Joseph Lead Company, which provided for a liquid propane gas tank unloading station on the industry sidetrack serving Viburnum Mine/Mill (hereinafter "1975 Supplement to 1967 Viburnum Mine/Mill Sidetrack Agreement"). The terms and conditions of the original agreement applied to the supplemental agreement unless otherwise provided for in the supplemental agreement. A copy of said supplemental agreement is attached hereto as Exhibit C.

82.    On November 1, 1986, with the consent of Burlington Northern Railroad, successor to Frisco, St. Joe Minerals Corp., as successor to St. Joseph Lead Company, assigned all its rights and obligations under the 1967 Viburnum Mine/Mill Sidetrack Agreement and its supplements to The Doe Run Company, a partnership consisting of Homestake Lead Company of Missouri and St. Joe Minerals Corp. A copy of the assignment from St. Joe Minerals Corp. to The Doe Run Company is attached hereto as Exhibit D.

83.    The 1967 Viburnum Mine/Mill Sidetrack Agreement and its supplements are, and at all times herein mentioned were, in effect between Frisco and its successors and St. Joseph Lead Company and its masters, partners, and successors.

84.    The foregoing sidetrack agreement and its supplements, and the indemnity provisions contained therein, were formed in a commercial setting by parties on substantially equal footing and were entered into without duress.

85.    The 1967 Viburnum Mine/Mill Sidetrack Agreement includes the following indemnity provisions:

a.    At paragraph 6: "Industry agrees to indemnify and hold harmless Frisco for loss, damage or injury from any act or omission of Industry or its employees or agents to the person or property of the parties and their employees, and to the person or property of any other person or corporation, while on or about the track; and if any claim or liability other than arising [from fire from engines] shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally."

b.    At paragraph 10(c): "Industry shall indemnify, protect and save harmless Frisco from and against all loss, damages, costs and expense in consequence of death of or injury to persons whomsoever and loss or destruction of or damage to property whatsoever or to whomsoever belonging, in any manner caused by, resulting from . . . the movement by Industry , its agent, servants or employees, of any car or cars on said track . . . ."

### Buick Mine/Mill Side Track Agreement

86.    In conjunction with the opening of the industry sidetrack to serve Buick Mine/Mill, Frisco entered into an industry sidetrack agreement with Homestake Lead Company of Missouri and Amax Lead Company of Missouri dated April 24, 1968, governing the construction, maintenance, operation and ownership of said industry

sidetrack (hereinafter referred to as "1968 Buick Mine/Mill Sidetrack Agreement"). A copy of the 1968 Buick Mine/Mill Sidetrack Agreement is attached hereto as Exhibit E.

87.     The 1968 Buick Mine/Mill Sidetrack Agreement was supplemented by agreement dated October 2, 1970, between Frisco and Amax Lead Company of Missouri and Homestake Lead Company of Missouri to add an 80-foot extension to the storage track at Buick Mine/Mill (hereinafter "1970 Supplement to 1968 Buick Mine/Mill Sidetrack Agreement"). The terms and conditions of the original agreement applied to the supplemental agreement unless otherwise provided for in the supplemental agreement. A copy of said supplemental agreement is attached hereto as Exhibit F.

88.     The 1968 Buick Mine/Mill Sidetrack Agreement was supplemented by agreement dated August 24, 1973, between Frisco and Amax Lead Company of Missouri and Homestake Lead Company of Missouri to add a scale track at Buick Mine/Mill (hereinafter "1973 Supplement to 1968 Buick Mine/Mill Sidetrack Agreement"). The terms and conditions of the original agreement applied to the supplemental agreement unless otherwise provided for in the supplemental agreement. A copy of said supplemental agreement is attached hereto as Exhibit G.

89.     On November 3, 1986, with the consent of Burlington Northern Railroad Company, as successor to Frisco, St. Joe Minerals Corp. assigned the 1968 Buick Mine/Mill Sidetrack Agreement and its supplements to The Doe Run Company, a partnership consisting of Homestake Lead Company of Missouri and St. Joe Minerals Corp. A copy of the assignment from St. Joe Minerals Corp. to The Doe Run Company is attached hereto as Exhibit H.

90.    The 1968 Buick Mine/Mill Sidetrack Agreement and its supplements are, and at all times herein mentioned were, in effect between Frisco and its successors and St. Joseph Lead Company and its masters, partners and successors.

91.    The foregoing sidetrack agreement and its supplements, and the indemnity provisions contained therein, were formed in a commercial setting by parties on substantially equal footing and were entered into without duress.

92.    The 1968 Buick Mine/Mill Sidetrack Agreement includes the following indemnity provisions:

      a.  .    At paragraph 6:  "Industry agrees to indemnify and hold harmless Frisco for loss, damage or injury from any act or omission of Industry or its employees or agents to the person or property of the parties and their employees, and to the person or property of any other person or corporation, while on or about the track; and if any claim or liability other than arising [from fire from engines, insufficient clearance, government orders, rules and regulations relating to dangerous articles, private crossings, movement of cars by Industry's motive power] shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally."

      b.    At paragraph 8:  "Industry further agrees to comply with all laws and all orders, rules and regulations issued by the Interstate Commerce Commission, or any other lawful authority, Federal or State, and all municipal ordinances, now or hereafter in effect, governing the loading, unloading and handling of explosives and other dangerous articles as defined in said laws, orders, rules and regulations and ordinances. . . . Industry shall protect, indemnify

and save harmless Frisco against all loss, damage, and expense in consequence of

death of or injury to persons whomsoever, or loss or destruction of or damage to

property whatsoever, and to whomsoever belonging, caused or directly

contributed to by reason of the violation by Industry of the provisions of this

paragraph."

        c.     At paragraph 12: "Industry may handle cars only over portion of

track owned by Industry by means of Industry's motive power. Industry agrees to

indemnify Frisco from loss, damage, and expense in consequence of death or

injury to persons or loss or destruction of property caused or contributed to by

reasons of the existence, operation, use, or maintenance of said motive power and

appurtenances thereto or by reasons of the violation by Industry of any of the

provisions of this paragraph."

93.    The 1973 Supplement to the 1968 Buick Smelter Unloading Station

Sidetrack Agreement contains the following indemnity provision:

"Industry shall protect, indemnify and save harmless Frisco against all loss,

damage and expense in consequence of death or injury to persons whomsoever, or

loss or destruction of or damage to property whatsoever, or whomsoever

belonging, caused or directly contributed to by reason of the use, operation,

ownership, maintenance, renewal, removal or operation over said track scale."

### Fletcher Transload Sidetrack Agreement and Lease Agreement

94.    In conjunction with the opening of the Fletcher Transload, Frisco and

St. Joseph Lead Company entered into an industry sidetrack agreement dated

the person or property of the parties hereto and their employees, and to the person

or property of any other person or corporation, while on or about said track, and if

any claim or liability other than arising under Sections 4 [fire caused by

locomotives], 5 [close clearances] and 6 [movement of cars by industry] hereof

shall arise from the joint or concurring negligence of both parties hereto, it shall

be borne by them equally."

100.    On June 9, 1987, The Doe Run Company terminated the 1979 Fletcher

Transload Sidetrack Agreement. A copy of the termination agreement is attached hereto

as Exhibit K.

101.    On June 1, 1991, Burlington Northern Railroad Company, a predecessor

of BNSF, entered into a lease agreement with The Doe Run Company, a partnership

consisting of St. Joe Minerals Corp., Doe Run Investment Holding Corporation and

Leadco Investments, Inc., for the construction and operation of a transload facility to

allow LOC transported by truck from Fletcher to be loaded into railcars (hereinafter

referred to as "1991 Fletcher Transload Lease"). A copy of the 1991 Fletcher Transload

Lease is attached hereto as Exhibit L.

102.    The 1991 Fletcher Transload Lease is, and at all times herein mentioned

was, in effect between Burlington Northern Railroad Company and its successors and

The Doe Run Company, its masters, partners and successors.

103.    The foregoing lease agreement, and the indemnity provisions contained

therein, was formed in a commercial setting by parties on substantially equal footing and

was entered into without duress.

104.    The 1991 Fletcher Transload Lease contains the following indemnity

provisions:

    a.    At paragraph 9: "Lessee shall not create or permit any condition

on the Premises that could present a threat to human health or to the environment.

Lessee shall indemnify and hold harmless Burlington from any suit or claim

growing out of any damages alleged to have been caused, in whole or in part, by

an unhealthful, hazardous, or dangerous condition caused by, contributed to, or

aggravated by Lessee's presence on and use of the Premises or Lessee's violation

of any laws, ordinances, regulations, or requirements pertaining to solid or other

wastes, chemicals, oil and gas, toxic, corrosive, or hazardous materials, air, water

(surface or groundwater) or noise pollution, and the storage, handling, use, or

disposal of any such material. . . . Lessee expressly agrees Lessee expressly

agrees that the indemnification and hold harmless obligations it hereby assumes

shall survive cancellation of this Lease."

    b.    At paragraph 10: "Lessee understands, as one of the material

considerations of this Lease without which it would not be granted, that Lessee

assumes all risk of injury or death of all persons, and damage to or loss or

destruction of buildings, contents, and all other property (including animals)

brought upon or in proximity to the Premises by Lessee, or by any other person

with the consent or knowledge of Lessee, without regard to whether such be the

result of negligence or misconduct of any person of any person in the employ or

service of Burlington or of defective trackage, equipment, or track structures.

Lessee hereby indemnifies and agrees to protect Burlington from all such injury

or death and loss, damage or destruction to property, including claims and causes

of action asserted against Burlington by any insurer of said property.

Notwithstanding the foregoing, however, lessee shall not be liable for injury to or

death of Burlington's employees or agents, and damage to or destruction of

rolling stock belonging to Burlington or others, or shipments of third parties in the

course of transportation, when said injury, death, damage or destruction is caused

by Burlington's own, sole negligence. . . . Lessee also agrees to indemnify and

hold harmless Burlington from any loss, damage, injury or death arising from any

act or omission of Lessee, Lessee's invitees, licensees, employees or agents, to the

person or property of the parties hereto and their employees, and to the person or

property of any other person or corporation while on or near the Premises."

### Buick Smelter LOC Unloading Station Sidetrack Agreement

105.    In conjunction with the opening of the industry sidetrack to serve the LOC

unloading station at Buick Smelter, Frisco and Amax-Homestake Lead Tollers, a

partnership of Homestake Smelting Company (a predecessor of Homestake Lead

Company of Missouri) and Missouri Lead Smelting Company, entered into an industry

sidetrack agreement dated April 24, 1968 governing the construction, maintenance,

operation and ownership of said industry sidetrack (hereinafter referred to as "1968 Buick

Smelter Unloading Station Sidetrack Agreement").  A copy of the 1968 Buick Smelter

Unloading Station Sidetrack Agreement is attached hereto as Exhibit M.

106.    The 1968 Buick Smelter Unloading Station Sidetrack Agreement was

supplemented by agreement dated July 7, 1971 between Frisco and Amax-Homestake

Lead Tollers for construction of loading docks (hereinafter referred to as "1971

Supplement to 1968 Buick Smelter Unloading Station Sidetrack Agreement"). The terms and conditions of the original agreement applied to the supplemental agreement unless otherwise provided for in the supplemental agreement. A copy of the 1971 Supplement to the 1968 Buick Smelter Unloading Station Sidetrack Agreement is attached hereto as Exhibit N.

107.    On August 11, 1986, with the consent of Burlington Northern Railroad Company, as successor to Frisco, Amax Lead Company of Missouri assigned its interest in the 1968 Buick Smelter Unloading Station Sidetrack Agreement, and its supplement, to Homestake Lead Company of Missouri. A copy of said assignment is attached hereto as Exhibit O.

108.    On November 1, 1986, with the consent of Burlington Northern Railroad Company, as successor to Frisco, Homestake Lead Company of Missouri assigned the 1968 Buick Smelter Unloading Station Sidetrack Agreement and its supplement to The Doe Run Company, a partnership of Homestake Lead Company of Missouri and St. Joe Minerals Corp. A copy of said assignment is attached hereto as Exhibit P.

109.    The 1968 Buick Smelter Unloading Station Sidetrack Agreement and its supplement are, and at all times herein mentioned were, in effect between Frisco and its successors and Homestake Smelting Company and its masters, partners and successors.

110.    The foregoing sidetrack agreement and its supplements, and the indemnity provisions contained therein, were formed in a commercial setting by parties on substantially equal footing and were entered into without duress.

111.    The 1968 Buick Smelter Unloading Station Sidetrack Agreement includes the following indemnity provisions:

a.    At paragraph 6: "Industry agrees to indemnify and hold harmless Frisco for loss, damage or injury from any act or omission of Industry or its employees or agents to the person or property of the parties and their employees, and to the person or property of any other person or corporation, while on or about the track; and if any claim or liability other than [fire from engines, inadequate clearances, violation of government orders, rules and regulations relating to dangerous articles, private road crossings, scale track or movement of cars] shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally."

b.    At paragraph 8: "Industry further agrees to comply with all laws and all orders, rules and regulations issued by the Interstate Commerce Commission, or any other lawful authority, Federal or State, and all municipal ordinances, now or hereafter in effect, governing the loading, unloading and handling of explosives and other dangerous articles as defined in said laws, orders, rules and regulations and ordinances. Industry shall protect, indemnify and save harmless Frisco against all loss, damage and expense in consequence of death of or injury to persons whomsoever, or loss or destruction of or damage to property whatsoever, and to whomsoever belonging, caused or directly contributed to by reason of the violation by Industry of any of the provisions of this paragraph."

c.    At paragraph 10: "Industry may construct and operate track scale at Station 1+79 as shown on print. Industry shall maintain track scale at Industry's sole expense. Industry shall protect, indemnify and save harmless

Frisco against all loss, damage and expense in consequence of death of or injury to persons whomsoever or loss or destruction of or damage to property whatsoever, and to whomsoever belonging, caused or directly contributed to by the existence, maintenance, use or operation of the track scale."

      d.    At paragraph 11: "Industry may handle cars only over portion of track owned by Industry by means of Industry's motive power. Industry agrees to indemnify Frisco from loss, damage, and expense in consequence of death or injury to persons or loss or destruction of property caused or contributed to by reason of the existence, operation, use or maintenance of the motive power and appurtenances thereto or by reasons of the violation by Industry of any of the provisions of this paragraph 11."

### Buick Recycling Center Sidetrack Agreement

112.    In conjunction with the opening of the industry sidetrack to serve the Buick Recycling Center, Burlington Northern Railroad Company, a predecessor of BNSF, and The Doe Run Company, a partnership of St. Joe Minerals Corp., Doe Run Investment Holding Corporation, and Fluor, entered into a sidetrack agreement dated December 28, 1990 (hereinafter referred to as "1990 Buick Smelter Recycling Center Sidetrack Agreement"). A copy of the 1990 Buick Smelter Recycling Center Sidetrack Agreement is attached hereto as Exhibit Q.

113.    The 1990 Buick Smelter Recycling Center Sidetrack Agreement is, and at all times herein mentioned was, in effect between Burlington Northern Railroad Company and its successors and The Doe Run Company, its masters, partners, and successors.

2415236                          25

114.    The foregoing sidetrack agreement and its supplements, and the indemnity provisions contained therein, were formed in a commercial setting by parties on substantially equal footing and were entered into without duress.

115.    The 1990 Buick Smelter Recycling Center Sidetrack Agreement contains the following indemnity provision:

"Industry shall indemnify and save harmless Burlington from any and all claims, demands, suits, losses, judgments, costs, damages, or expense on account of injuries to or death of any and all person whomsoever, and any and all loss or destruction of or damage to property to whomsoever belonging, including property owned by, leased or rented to, or in the care, custody or control of the parties hereto, arising or growing out of or in any manner connected with the construction, maintenance, operation, and use of the Track covered by this Agreement, or caused or occasioned, in whole or in part, by reason of or arising during the presence of the person of Industry, its subcontractors, the employee or agents of either, or third parties upon or in proximity to or while en route to or returning form the Track covered by this Agreement.  If any claim or liability shall arise from the joint or concurring negligence of the parties hereto, it shall be borne by them equally."

### Car Lease Agreement

116.    On April 5, 1991, The Burlington Northern Railroad Company, a predecessor of BNSF, and The Doe Run Company entered into a car lease agreement governing the provision of railcars by BNSF to The Doe Run Company for hauling LOC

from the load out facilities on the Lead Line to Herculaneum Smelter and other destinations (hereinafter referred to as "1991 Car Lease Agreement").

117.    The foregoing car lease agreement and its supplements, and the indemnity provisions contained therein, were formed in a commercial setting by parties on substantially equal footing and were entered into without duress.

118.    The 1991 Car Lease Agreement contains the following indemnity provision at paragraph 5:

"Lessee [The Doe Run Company] hereby agrees to indemnify and save harmless Burlington from an against any and all liability, demands, and causes of action, whether well-founded or otherwise, including the cost of defending same, for bodily injury to or death of any person and loss of or damage to the property of any person whatsoever, including the parties hereto or the employees of either of them, arising out of or in connection with the possession, use, or operation of the said cars leased by lessee herein, whether said loss, damage, injury, or death is caused by or contributed to by the negligence of Burlington, its agents, servants, employees, or otherwise or whether said damage shall be the result of obvious defects, latent defects, or other causes, and lessee shall not call upon Burlington for contribution in any sum whatsoever by reason of the fact that Burlington is the owner of said cars."

### Successor Liability On Sidetrack And Lease Agreements

119.    The Doe Run Resources Corporation, as master, partner, and/or successor to St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri,

Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Fluor Corporation, A.T. Massey Coal Company, Doe Run Investment Holding Corporation, Leadco Investments, Inc., and The Doe Run Company, is liable to BNSF for the contractual indemnification obligations contained in the 1967 Viburnum Mine/Mill Sidetrack Agreement, the 1968 Buick Mine/Mill Sidetrack Agreement, the 1968 Buick Smelter Unloading Station Sidetrack Agreement, the 1968 Fletcher Transload Sidetrack Agreement, the 1979 Fletcher Transload Sidetrack Agreement, the 1990 Buick Smelter Recycling Center Sidetrack Agreement, and the 1991 Fletcher Transload Lease Agreement with respect to operations at those respective locations, and the 1991 Car Lease Agreement with respect to shipments of LOC from or to any of those locations, that gave rise to any injury, damage, or liability to BNSF.

120.    Homestake Lead Company of Missouri, as master, partner and/or successor to Homestake Lead Smelting Company, Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Amax, Inc., St. Joseph Lead Company, St. Joe Minerals Corp., and The Doe Run Company, is liable to BNSF for the contractual indemnification obligations contained in the 1967 Viburnum Mine/Mill Sidetrack Agreement, the 1968 Buick Mine/Mill Sidetrack Agreement, the 1968 Buick Smelter Unloading Station Sidetrack Agreement, the 1968 Fletcher Transload Sidetrack Agreement, and the 1979 Fletcher Transload Sidetrack Agreement with respect to operations at those respective locations that gave rise to any injury, damage, or liability to BNSF.

121.    Missouri Lead Smelting Company, as master, partner, and/or successor to Amax Lead Company of Missouri, Amax-Homestake Lead Tollers, Amax, Inc., and The

Doe Run Company, is liable to BNSF for the contractual indemnification obligations contained in the 1967 Viburnum Mine/Mill Sidetrack Agreement, the 1968 Buick Mine/Mill Sidetrack Agreement, the 1968 Buick Smelter Unloading Station Sidetrack Agreement, the 1968 Fletcher Transload Sidetrack Agreement, and the 1979 Fletcher Transload Sidetrack Agreement with respect to operations at those respective locations that gave rise to any injury, damage, or liability to BNSF.

122.    Cyprus-Amax Minerals Corporation, as master, partner and/or successor to Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Amax, Inc., Homestake Lead Company of Missouri, and Homestake Smelting Company, is liable to BNSF for the contractual indemnification obligations contained in the 1967 Viburnum Mine/Mill Sidetrack Agreement, the 1968 Buick Mine/Mill Sidetrack Agreement, the 1968 Buick Smelter Unloading Station Sidetrack Agreement, the 1968 Fletcher Transload Sidetrack Agreement, and the 1979 Fletcher Transload Sidetrack Agreement with respect to operations at those respective locations that gave rise to any injury, damage, or liability to BNSF.

123.    Fluor Corporation, as master, partner, and/or successor to St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, A.T. Massey Coal Company, Doe Run Investment Holding Corporation, Leadco Investments, Inc., and The Doe Run Company, is liable to BNSF for the contractual indemnification obligations contained in the 1967 Viburnum Mine/Mill Sidetrack Agreement, the 1968 Buick Mine/Mill Sidetrack Agreement, the 1968 Buick Smelter Unloading Station Sidetrack Agreement, the 1968

Fletcher Transload Sidetrack Agreement, the 1979 Fletcher Transload Sidetrack Agreement, the 1990 Buick Smelter Recycling Center Sidetrack Agreement, and the 1991 Fletcher Transload Lease Agreement with respect to operations at those respective locations, and the 1991 Car Lease Agreement with respect to shipments of LOC from or to any of those locations, that gave rise to any injury, damage, or liability to BNSF.

124.    Doe Run Investment Holding Corporation, as master, partner and/or successor to St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Amax, Inc., Fluor Corporation, A.T. Massey Coal Company, Leadco Investments, Inc., and The Doe Run Company, is liable to BNSF for the contractual indemnification obligations contained in the 1967 Viburnum Mine/Mill Sidetrack Agreement, the 1968 Buick Mine/Mill Sidetrack Agreement, the 1968 Buick Smelter Unloading Station Sidetrack Agreement, the 1968 Fletcher Transload Sidetrack Agreement, the 1979 Fletcher Transload Sidetrack Agreement, the 1990 Buick Smelter Recycling Center Sidetrack Agreement, and the 1991 Fletcher Transload Lease Agreement with respect to operations at those respective locations, and the 1991 Car Lease Agreement with respect to shipments of LOC from or to any of those locations, that gave rise to any injury, damage, or liability to BNSF.

125.    DR Acquisition Corp., as master, partner and/or successor to St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, A.T. Massey Coal Company, Doe

Run Investment Holding Corporation, Leadco Investments, Inc., Fluor Corporation, and The Doe Run Company, is liable to BNSF for the contractual indemnification obligations contained in the 1967 Viburnum Mine/Mill Sidetrack Agreement, the 1968 Buick Mine/Mill Sidetrack Agreement, the 1968 Buick Smelter Unloading Station Sidetrack Agreement, the 1968 Fletcher Transload Sidetrack Agreement, the 1979 Fletcher Transload Sidetrack Agreement, the 1990 Buick Smelter Recycling Center Sidetrack Agreement, and the 1991 Fletcher Transload Lease Agreement with respect to operations at those respective locations, and the 1991 Car Lease Agreement with respect to shipments of LOC from or to any of those locations, that gave rise to any injury, damage, or liability to BNSF.

126.    The Renco Group, Inc., as master, partner and/or successor to St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri, Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, A.T. Massey Coal Company, Doe Run Investment Holding Corporation, Leadco Investments, Inc., Fluor Corporation, DR Acquisition Corp., and The Doe Run Company, is liable to BNSF for the contractual indemnification obligations contained in the 1967 Viburnum Mine/Mill Sidetrack Agreement, the 1968 Buick Mine/Mill Sidetrack Agreement, the 1968 Buick Smelter Unloading Station Sidetrack Agreement, the 1968 Fletcher Transload Sidetrack Agreement, the 1979 Fletcher Transload Sidetrack Agreement, the 1990 Buick Smelter Recycling Center Sidetrack Agreement, and the 1991 Fletcher Transload Lease Agreement with respect to operations at those respective locations, and the 1991 Car

Lease Agreement with respect to shipments of LOC from or to any of those locations,

that gave rise to any injury, damage, or liability to BNSF.

127.    A.T. Massey Coal Company, as master, partner, and/or successor to

St. Joseph Lead Company, St. Joe Minerals Corp., Homestake Lead Company of

Missouri, Homestake Lead Smelting Company, Amax Lead Company of Missouri,

Missouri Lead Smelting Company, Amax-Homestake Lead Tollers, Doe Run Investment

Holding Corporation, Leadco Investments, Inc., and The Doe Run Company, is liable to

BNSF for the contractual indemnification obligations contained in the 1967 Viburnum

Mine/Mill Sidetrack Agreement, the 1968 Buick Mine/Mill Sidetrack Agreement, the

1968 Buick Smelter Unloading Station Sidetrack Agreement, the 1968 Fletcher

Transload Sidetrack Agreement, the 1979 Fletcher Transload Sidetrack Agreement, the

1990 Buick Smelter Recycling Center Sidetrack Agreement, and the 1991 Fletcher

Transload Lease Agreement with respect to operations at those respective locations, and

the 1991 Car Lease Agreement with respect to shipments of LOC from or to any of those

locations, that gave rise to any injury, damage, or liability to BNSF.

### Loading, Load Adjusting, And Unloading Railcars

128.    Starting in 1967 until July 1999, Frisco and its successors hauled LOC

from Viburnum Mine/Mill and Fletcher Transload to Herculaneum Smelter and other

destinations for the companies that owned and operated the mines, mills and smelters on

the Lead Line and the smelter at Herculaneum (hereinafter referred to as "mining

companies").

129.    Starting in 1967 until about July 1999, Frisco and its successors hauled LOC from Buick Mine/Mill to Buick Smelter and Herculaneum Smelter and other destinations for the mining companies.

130.    Mining companies loaded LOC into railcars at Viburnum Mine/Mill, Buick Mine/Mill, and Fletcher Transload in an area at each facility known as the "load out area."

131.    Mining companies loaded LOC into railcars wet in order to prevent dust from being generated during the loading and transportation of the LOC.

132.    As long as the LOC remained in a large pile in the load out area, a crust would form on the outer surface of the pile that would keep the LOC within the pile moist, which would prevent dust from being generated from the pile or during the loading operation.

133.    At one time, mining companies used an overhead conveyor system at Viburnum Mine/Mill and Buick Mine/Mill to load LOC into railcars by dropping the LOC directly into the railcars as the cars were moved along the industry sidetrack beneath the end of the conveyor.

134.    Mining companies discontinued using the overhead conveyor system for loading LOC into railcars at Viburnum Mine/Mill and Buick Mine/Mill after a short period of time and instead dropped into a large pile on the ground and used front-end loaders to scoop the LOC off the ground and drop it into railcars standing on the industry sidetrack that served the facility.

135.    Mining companies often spilled LOC onto the ground in the load out area at Viburnum Mine/Mill and Buick Mine/Mill while using front-end loaders to load LOC into railcars.

136.    After loading the railcars with LOC at Viburnum Mine/Mill and Buick Mine/Mill, mining companies weighed the railcars on the track scale in the load out area at that facility.

137.    If a railcar weighed less than what constituted a full load, mining companies used a front-end loader to add additional LOC to the car until the car reached the weight that constituted a full load.

138.    If a railcar weighed more than the maximum permitted for shipment, mining companies used a front-end loader to remove LOC from the overloaded railcar until the car no longer exceeded the maximum weight.

139.    Mining companies often spilled LOC onto the ground in the area of the track scale at Viburnum Mine/Mill and Buick Mine/Mill while using front-end loaders to remove LOC from railcars to achieve the correct weight.

140.    At Fletcher Transload, mining companies used an overhead crane to pick up canisters of LOC from the back of flatbed trucks that mining companies used to transport the loaded canisters from Fletcher Mine/Mill to Fletcher Transload, and poured the LOC from the canisters into railcars standing on the sidetrack that served that facility.

141.    The area where mining companies loaded LOC into railcars at Fletcher Transload was known as the load out area.

142.    Mining companies loaded LOC wet into the canisters at Fletcher Mine/Mill and the LOC was still wet when the canisters were emptied into railcars at

Fletcher Transload to prevent dust from being generated during loading and transportation of the LOC.

143.    Mining companies sometimes spilled LOC onto the ground in the load out area while using the overhead crane at Fletcher Transload to load LOC into railcars.

144.    After mining companies loaded the railcars with LOC at Fletcher Transload, the cars were weighed on the track scale at Buick Mine/Mill or Buick Smelter.

145.    If a railcar weighed less than what constituted a full load, mining companies used a front-end loader to add additional LOC to the car until the car reached the weight that constituted a full load.

146.    If a railcar weighed more than the maximum permitted for shipment, mining companies used a front-end loader to remove LOC from the overloaded railcar until the car no longer exceeded the maximum weight.

147.    Mining companies often spilled LOC onto the ground in the area of the track scale while using the front-end loader to add or remove LOC from railcars at the track scale.

148.    The LOC that spilled onto the ground during loading and adjusting of loads at the load out areas at Viburnum Mine/Mill, Buick Mine/Mill, and Fletcher Transload, and at the track scales at Viburnum Mine/Mill, Buick Mine/Mill and Buick Smelter would dry out and form a fine dust if the ground in these areas was not kept wet.

149.    When the spilled LOC dried out, it would become a fine dust that was subject to being stirred up by the wind.

150.    LOC dust that was stirred up by the wind would get into the air and settle onto railroad equipment that was standing on the industry sidetrack at the load out areas

at Viburnum Mine/Mill, Buick Mine/Mill, and Fletcher Transload, and the track scales at

Viburnum Mine/Mill, Buick Mine/Mill, and Buick Smelter, including the tops, sides,

beams, ladders, steps, grab irons, handholds, handbrakes, pin pullers, couplers, air hoses,

angle cocks and other parts and appliances of railroad cars, engines, and cabooses, and

onto the catwalks, floors, seats, chairs, tables, working surfaces, controls, window sills

and handles, doors and door handles, and other interior and exterior surfaces of railroad

engines and cabooses, and onto the clothing and exposed skin, hair and nails of railroad

employees who were working on, about or near the industry sidetrack and into the noses,

mouths, throats, and air passages of such railroad employees.

151.    LOC dust that settled onto the railroad equipment as described above

remained on the equipment when the equipment traveled to other stations or railyards

including Lindenwood yard in the City of St. Louis, Missouri.

152.    Mining companies did not cover the tops of the railcars after loading the

cars with LOC or spray any type of "binder" on the LOC in the railcars to prevent the

LOC from drying out in transit.

153.    While in transit, the LOC in the cars would dry out and form a fine dust

that was subject to being blown out of the cars during movement of the railcars or from

the wind while the cars were stopped or moving.

154.    While the cars were being transported by Frisco and its successors, LOC

dust would blow out the tops of the cars and get into the air and settle onto the railroad

equipment, including the tops, sides, beams, ladders, steps, grab irons, handholds,

handbrakes, pin pullers, couplers, air hoses, angle cocks and other parts and appliances of

railroad cars, engines and cabooses, and onto the catwalks, floors, seats, chairs, tables,

working surfaces, controls, window sills, and handles, doors and door handles, and other interior and exterior surfaces of railroad engines and cabooses, and onto the clothing and exposed skin, hair and nails of railroad employees who were working on, about or near such railroad equipment and into the noses, mouths, throats, air passages and lungs of such railroad employees.

155.    Mining companies used front-end loaders at Viburnum Mine/Mill, Buick Mine/Mill and Buick Smelter to move railcars along the side tracks at those locations after the cars were brought to those locations by the railroad.

156.    During loading of the railcars and adjusting of the loads at Viburnum Mine/Mill, Buick Mine/Mill, and Buick Smelter, mining companies sometimes punched holes into the sides of the railcars when the buckets on the front-end loaders came into contact with the sides of the railcars.

157.    During movement of the railcars at Viburnum Mine/Mill, Buick Mine/Mill, and Buick Smelter, mining companies sometimes punched holes into the sides of the railcars when the buckets on the front-end loaders came into contact with the sides of the railcars.

158.    Mining companies failed to adequately repair or otherwise plug the holes that were punched into the sides of the railcars by the buckets on the front-end loaders before loading the cars with LOC and releasing the cars to the railroad for shipment.

159.    The railcars that were used to ship LOC from Viburnum Mine/Mill, Buick Mine/Mill, and Fletcher Transload had drain holes in the bottoms of the railcars to allow rain water and snow melt to drain out of the cars when the cars were empty or when they

were loaded with lading that would not leak out of the cars, such as scrap metal or railroad ties.

160.   The drain holes in the bottoms of the railcars used to ship LOC were supposed to be plugged by the shipper before the cars were loaded with LOC.

161.   Mining companies often failed to securely plug the drain holes in the bottoms of the railcars used to ship LOC before loading the cars with LOC.

162.   As a consequence of the failure of mining companies to adequately repair or otherwise plug the holes in the sides of the railcars and securely plug the drain holes in the bottoms of the railcars, LOC leaked out of the railcars while the cars were stopped on or were being transported over BNSF's railyards, sidings and tracks, including Lindenwood Yard in the City of St. Louis, Missouri, particularly after a rain or snow.

163.   LOC that leaked out of railcars contaminated the ballast and right-of-way of BNSF's railyards, sidings, and tracks.

164.   Railcars loaded with LOC that were moved from Buick Mine/Mill to Buick Smelter were unloaded at the smelter at an unloading shed where cars were positioned on a track above storage bins and mining companies opened the bottom dump doors of the cars to allow LOC into the bins beneath the track.

165.   The residual LOC that remained in the storage bins beneath the unloading shed at Buick Smelter after the piles of LOC in the storage bin were moved to the smelter would dry out if mining companies did not keep the storage bins sprinkled with water between loads of LOC being dropped into the bins.

166.   When the residual LOC in the storage bins dried out, it would produce a fine dust.

167.    When residual LOC in the storage bins dried out and turned to dust, each time a load of LOC was dumped from a railcar into the storage bin, the impact of the LOC hitting the bottom of the storage bin would stir up the dust and force the dust into the air.

168.    Under these circumstances, LOC dust rose from the bottom of the storage bin into the unloading shed and settled onto the railcars that were standing on the industry sidetrack that served the unloading shed, including the tops, sides, beams, ladders, steps, grab irons, handholds, handbrakes, pin pullers, couplers, air hoses, angle cocks and other parts and appliances of the railcars, and onto the clothing and exposed skin, hair, and nails of railroad employees who were working on, about or near the unloading shed, and into the noses, mouths, throats and air passages of such railroad employees.

169.    LOC dust that settled onto BNSF's rail equipment as described above remained on the equipment when the equipment traveled to other stations or railyards, including Lindenwood Yard in the City of St. Louis, Missouri.

170.    Railcars loaded with LOC that were shipped to Herculaneum Smelter were unloaded by mining companies at the smelter using a rotary dump that picked up the loaded cars, rotated them until they were upside down, and then shook the cars.

171.    LOC would often spill from the railcars onto the ground during this unloading process.

172.    The LOC that spilled onto the ground during the unloading process at Herculaneum Smelter would dry out and form a fine dust if the ground in this area was not kept wet.

173.   When the spilled LOC dried out, it became a fine dust that was subject to being stirred up by the wind.

174.   LOC dust that was stirred up by the wind would get into the air and settle onto railroad equipment that was standing on the industry sidetrack that served the rotary dump at Herculaneum Smelter, including the tops, sides, beams, ladders, steps, grab irons, handholds, handbrakes, pin pullers, couplers, air hoses, angle cocks and other parts and appliances of the railcars.

175.   LOC dust that settled onto the railcars as described above remained on the equipment when the equipment traveled to other stations or railyards, including Lindenwood Yard in the City of St. Louis, Missouri.

176.   The rotary dump at Herculaneum Smelter was designed to shake the cars during unloading of the cars in order to remove all of the LOC from the cars.

177.   The rotary dump at Herculaneum Smelter did not always work as intended and sometimes would not adequately shake the cars during the unloading process.

178.   As a result of the rotary dump at Herculaneum Smelter not adequately shaking the cars during the unloading process, the cars sometimes contained significant quantities of LOC after being unloaded, which could amount to a ton or more.

179.   Mining companies did not check the cars after the cars were unloaded at Herculaneum Smelter to see if the cars still contained LOC before releasing the cars back to the railroad as "empty."

180.   Mining companies did not make any effort to use additional means to remove the LOC that remained in the railcars after mining companies unloaded the cars using the rotary dump at Herculaneum Smelter.

## Cleaning Cars at Cherryville Siding

181.    After cars were unloaded at Herculaneum Smelter and released back to the railroad as "empty," the cars were sometimes routed by the railroad to other shippers for loading with scrap metal, wooden ties, ballast, or other materials before the cars were routed back to Viburnum Mine/Mill, Buick Mine/Mill, or Fletcher Transload for loading with LOC.

182.    Mining companies refused to accept cars for loading with LOC if the cars contained debris from a previous non-LOC loading.

183.    Starting in about 1967 and continuing until 1994, before delivering a car to Viburnum Mine/Mill, Buick Mine/Mill or Fletcher Transload for loading with LOC, Frisco and its successors would route the car to a siding on the Lead Line in Crawford County, Missouri near Cherryville (hereinafter "Cherryville Siding") for cleaning if the car contained debris from a previous non-LOC loading.

184.    Frisco and its successors hired independent contractors to perform the car cleaning at Cherryville Siding.

185.    Unknown to Frisco or its successors, the debris from non-LOC loadings that was removed from the cars at Cherryville Siding was contaminated with LOC as a result of mining companies having released the cars as "empty" at Herculaneum Smelter after the cars were unloaded even though the cars still contained significant quantities of LOC.

186.    The contractors that cleaned railcars at Cherryville Siding initially deposited the LOC-contaminated debris that was removed from the cars onto the ground at Cherryville Siding, but later hauled some of the debris away and deposited it onto the

ground at building sites, parking lots, driveways, ditches, and other locations in Crawford County, Missouri.

187.    The process of cleaning LOC-contaminated debris from railcars, moving it to various locations in Crawford County, Missouri, and depositing it onto the ground caused LOC dust to be stirred up and to enter the air and settle onto the clothing and exposed skin, hair and nails of employees of the car cleaning contractor who performed such work and other persons in the vicinity of the car cleaning operations and into the noses, mouths, throats and air passages of such persons.

188.    At locations where LOC-contaminated debris from the car cleaning operations was deposited on the ground, LOC dust was stirred up by the wind and eventually settled onto the interior and exterior surfaces of buildings and motor vehicles in the vicinity of such deposits of LOC-contaminated debris and onto the clothing and exposed skin, hair and nails of people who were present at such locations and entered the noses, mouths, throats and air passages of such people.

## Non-Employee Exposure Claims Against BNSF

189.    Beginning in 1998, individuals who had worked for the car cleaning contractors at Cherryville Siding or who had otherwise spent a significant amount of time at Cherryville Siding during car cleaning operations, began asserting personal injury claims against BNSF alleging that they had been exposed to toxic levels of lead and other hazardous substances at Cherryville Siding through inhalation and/or ingestion of LOC dust (hereinafter referred to as "non-employee claimants allegedly exposed to LOC at Cherryville").

190.    Beginning in 1998, individuals who had lived, worked or regularly visited locations in the vicinity of deposits of LOC-contaminated debris from the railcar cleaning operations at Cherryville Siding began asserting personal injury claims against BNSF alleging that they had been exposed to toxic levels of lead and other hazardous substances at such sites through inhalation and/or ingestion of LOC dust (hereinafter referred to as "non-employee claimants allegedly exposed to LOC at locations other than Cherryville").

191.    The non-employee claimants claimed serious injury as a result of exposure to LOC including brain damage, peripheral neuropathy, hypertension, future kidney disease, premature aging, cancer and many other diseases, plus fear of future injury, disease, and deterioration.

192.    The claims of the "non-employee claimants allegedly exposed to LOC at Cherryville" and the "non-employee claimants exposed to LOC at locations other than Cherryville" (including claims brought by representatives of deceased individuals) were asserted against BNSF in three different groups of claims or lawsuits known as the "Crider Claimants," "King Claimants," and "Simpson Claimants."

193.    The list attached hereto as Exhibit R identifies each claimant (or decedent) in the group of "Crider Claimants."

194.    The list attached hereto as Exhibit S identifies each claimant (or decedent) in the group of "King Claimants."

195.    The list attached hereto as Exhibit T identifies each claimant (or decedent) in the group of "Simpson Claimants."

196.    BNSF vigorously defended the claims of the non-employee claimants, but eventually settled all the non-employee claims except the claims of James King and Lisa

King (which are still pending) before trial to avoid the risk of substantial jury verdicts being entered against BNSF on those claims.

197.    BNSF incurred substantial attorneys fees and expenses in defending each group of non-employee claims.

198.    BNSF's liability to the non-employee claimants with whom it settled was based on conditions created by Defendants as herein alleged.

199.    BNSF paid substantial sums to settle the claims of the non-employee claimants (including claims brought by representatives of deceased individuals) without participation by any of the Defendants.

200.    For and in consideration of the settlements it paid to the non-employee claimants (including claims brought by representatives of deceased individuals), BNSF obtained general releases of liability from each of the non-employee claimants that released not only BNSF, but all other potentially liable persons, including the Defendants herein, from any and all liability to said claimants arising from their alleged exposure to LOC.

201.    The settlements BNSF made with non-employee claimants were reasonable and were made in good faith.

202.    BNSF incurred substantial legal fees and expenses to investigate and defend the claims of the non-employee claimants.

### Employee Exposure Claims Against BNSF

203.    Beginning in 1999, past and current employees and representatives of deceased employees of BNSF and its predecessors began asserting personal injury claims and wrongful death claims against BNSF under the Federal Employers Liability Act, 45

U.S.C. §§ 51, *et seq.* ("FELA"), alleging that they or their decedent had been exposed to toxic levels of lead and other hazardous substances through inhalation and/or ingestion of LOC dust while working at various locations between Fletcher Transload and the interchange tracks at Crystal City, where BNSF dropped off and picked up railcars going to and coming from Herculaneum Smelter.

204.    The FELA Claimants claimed serious injury as a result of exposure to LOC, including brain damage, peripheral neuropathy, hypertension, future kidney disease, premature aging, cancer, and many other diseases, plus fear of future injury, disease, deterioration, and, in the case of some of the decedents, death.

205.    The claims of the FELA claimants (including claims brought by representatives of deceased individuals) were asserted against BNSF in three different groups of claims or lawsuits, known as the "Ellison FELA Claimants," the "Andrews FELA Claimants," and the "Bray FELA Claimants."

206.    The list attached hereto as Exhibit U identifies each claimant (or decedent) in the group of "Ellison FELA Claimants."

207.    The list attached hereto as Exhibit V identifies each claimant (or decedent) in the group of "Andrews FELA Claimants."

208.    The list attached hereto as Exhibit W identifies each claimant (or decedent) in the group of "Bray FELA Claimants."

209.    BNSF vigorously defended the claims of the FELA claimants (including claims of representatives of decedents), but eventually settled all the claims before trial to avoid the risk of substantial jury verdicts being entered against BNSF on these claims.

210.    BNSF incurred substantial attorneys fees and expenses in defending each group of FELA claims.

211.    BNSF's liability to the FELA claimants was based on conditions created by Defendants as herein alleged.

212.    BNSF paid substantial sums to settle the claims of the Ellison FELA claimants (including claims of representatives of deceased individuals) with participation by the Defendants herein and with BNSF reserving its claims against The Doe Run Resources Corporation for contribution and indemnity with respect to the settlement of the claims of the Ellison FELA claimants.

213.    For and in consideration of the settlements paid to the Ellison FELA claimants (including claims of representatives of deceased individuals), each of the Ellison FELA claimants gave general releases to the Defendants herein that released each of the Defendants herein from any and all liability to said claimants arising from their alleged exposure to LOC subject to a separate settlement agreement between BNSF and the Defendants herein that preserved certain claims for contribution and indemnity between BNSF and The Doe Run Resources Corporation.

214.    The settlements BNSF made with the Ellison FELA claimants were reasonable and were made in good faith.

215.    BNSF incurred substantial legal fees and expenses to investigate and defend the claims of the Ellison FELA claimants.

216.    BNSF paid substantial sums to settle the claims of the Andrews FELA claimants (including claims of representatives of deceased individuals) without participation by any of the Defendants herein.

217.    For and in consideration of the settlements it paid to the Andrews FELA claimants (including claims of representatives of deceased individuals), BNSF obtained general releases of liability from each of the Andrews FELA claimants that released not only BNSF, but all other potentially liable persons, including the Defendants herein, from any and all liability to said claimants arising from their alleged exposure (or the exposure of their decedent) to LOC, and expressly reserved BNSF's claims against the Defendants herein for contribution and indemnity with respect to the settlement of the claims of the Andrews FELA claimants.

218.    The settlements BNSF made with the Andrews FELA claimants were reasonable and were made in good faith.

219.    BNSF incurred substantial legal fees and expenses to investigate and defend the claims of the Andrews FELA claimants.

220.    BNSF paid substantial sums to settle the claims of the Bray FELA claimants (including claims of representatives of deceased individuals) with participation by Homestake Lead Company of Missouri, Cyprus Amax Minerals Company, and Missouri Lead Smelting Company (but not the other Defendants herein) and with BNSF reserving its claims against the Defendants herein other than Homestake Lead Company of Missouri, Cyprus-Amax Minerals Company, and Missouri Lead Smelting Company for indemnity with respect to the settlement of the claims of the Bray FELA claimants.

221.    For and in consideration of the settlements it paid to the Bray FELA claimants (including claims of representatives of deceased individuals), BNSF obtained general releases of liability from each of the Bray FELA claimants that released BNSF Homestake Lead Company of Missouri, Cyprus-Amax Minerals Company, and Missouri

Lead Smelting Company from any and all liability to said claimants arising from their exposures (or the exposures of their decedent) to LOC, and expressly reserved BNSF's claims against the Defendants herein other than Homestake Lead Company, Cypress-Amax Minerals Company, and Missouri Lead Smelting Company for indemnity with respect to the settlement of the claims of the Bray FELA claimants.

222.    The settlements BNSF made with the Bray FELA claimants were reasonable and were made in good faith.

223.    BNSF incurred substantial legal fees and expenses to investigate and defend the claims of the Bray FELA claimants.

## Lead Contamination In Rail Yards

224.    In February 1998, BNSF learned that piles of yard cleaning waste in its Lindenwood railyard in the City of St. Louis, Missouri were contaminated with lead.

225.    In October 2000, BNSF learned that the ballast and right-of-way at various places in its Cuba railyard in Crawford County, Missouri were contaminated with lead.

226.    In July 2004, BNSF learned that the ballast and right-of-way in various railyards, sidings and tracks between and including Fletcher Transload and the interchange tracks at Crystal City, Missouri were contaminated with lead.

227.    The aforesaid lead contamination of the ballast and right-of-way in BNSF's railyards, sidings and tracks, including the yard cleaning waste at Lindenwood Yard, was from LOC that blew out the tops or leaked out of holes in railcars loaded with LOC.

228.    BNSF has cleaned up the LOC-contaminated ballast and right-of-way in Cuba yard and the contaminated yard cleaning waste at Lindenwood Yard.

229.    BNSF is making arrangements to clean up the LOC-contaminated ballast and right-of-way at other locations on its rail line where such contamination has been found.

230.    BNSF faced potential liability to the Missouri Department of Natural Resources for the LOC contamination in its railyards, sidings and tracks, and faces potential future liability to the Missouri Department of Natural Resources for the LOC contamination in its yards, sidings and tracks that has not yet been cleaned up.

231.    BNSF incurred substantial cost and expense to clean up the LOC contamination of its ballast and right-of-way in its Cuba railyard and the LOC-contaminated yard cleaning waste in its Lindenwood yard and will incur substantial cost and expense in the future to clean up LOC-contaminated ballast and right-of-way at other locations on its rail line.

232.    The cost and expense BNSF incurred to cleanup LOC contamination in its Lindenwood and Cuba railyards was reasonable and was incurred in good faith.

233.    BNSF has incurred substantial attorneys' fees and expense to investigate the LOC-contamination of its Cuba and Lindenwood yards and to negotiate a cleanup plan with the Missouri Department of Natural Resources and to arrange for the cleanup and will incur substantial attorneys' fees and expenses in the future to investigate the LOC-contamination at the other locations hereinbefore alleged and to negotiate a cleanup plan.

### Tender of Defense and Demand for Indemnity

234.    On or about March 31, 2000, BNSF made demand on The Doe Run Resources Corporation to participate in and contribute toward the resolution of claims

arising from LOC contamination of railroad sidings in Crawford County, Missouri and the immediately adjacent counties and other sites to which materials from such sidings were allegedly transported.

235.    The Doe Run Resources Corporation refused said demand.

236.    On January 23, 2001, BNSF implicitly tendered the defense of pending non-employee and FELA claims to The Doe Run Resources Corporation, Fluor Corporation, Doe Run Investment Holding Corporation, A.T. Massey Coal Company, and Homestake Lead Mining Company of Missouri by mailing to counsel for said companies a draft of a proposed legal agreement between BNSF and said companies with language that stated that a tender of defense already had been made.

237.    On June 6, 2001, The Doe Run Resources Corporation, Fluor Corporation, Doe Run Investment Holding Corporation, and A.T. Massey Coal Company implicitly acknowledged BNSF's tender of defense of pending non-employee and FELA claims by returning a revised draft of the aforesaid proposed legal agreement to BNSF with language that acknowledged that a tender of defense already had been made.

238.    On May 15, 2002, The Doe Run Resources Corporation, Fluor Corporation, Doe Run Investment Holding Corporation, A.T. Massey Coal Company, Homestake Lead Company of Missouri, Missouri Lead Smelting Company, and Cyprus Amax Minerals Corporation implicitly acknowledged BNSF's tender of defense of pending non-employee and FELA claims by signing a tolling agreement with BNSF that tolled the running of the statute of limitations on BNSF's claims for contribution and indemnity with respect to such claims.

2415236

239.    On July 23, 2002, The Doe Run Resources Corporation, Fluor Corporation, Doe Run Investment Holding Corporation, A.T. Massey Coal Company, Homestake Lead Company of Missouri, Missouri Lead Smelting Company, and Cyprus Amax Minerals Corporation implicitly acknowledged BNSF's tender of defense of pending non-employee and FELA claims by signing a letter that referenced the intention of BNSF and the lead mining companies to assert claims for contribution and indemnity against one another.

240.    On December 19, 2002, BNSF made express written demand on The Doe Run Resources Corporation, Fluor Corporation, Doe Run Investment Holding Corporation, A.T. Massey Coal Company, and Homestake Lead Company of Missouri to take over the defense of pending non-employee and FELA claims and to indemnify BNSF against any liability therefrom.

241.    On January 6, 2003, BNSF made express written demand on Missouri Lead Smelting Company and Cyprus Amax Minerals Corporation to take over the defense of pending non-employee and FELA claims and to indemnify BNSF against any liability therefrom.

242.    The aforesaid companies refused to accept BNSF's tender of defense or to take over the defense of the aforesaid claims as demanded by BNSF.

## Settlement Demand Made and Refused

243.    On March 29, 2005, BNSF made written settlement demand on Defendants pursuant to §408.040, RSMo, which demand was refused by Defendants.

## COUNT I
### (The Doe Run Resources Corporation – Non-Employee Claimants
### Allegedly Exposed to LOC at Cherryville – Contractual Indemnity)

244.    BNSF adopts and incorporates herein by reference the allegations of paragraphs 1 through 243 of this Petition.

245.    All references in Counts I through X of this Petition to "mining company" are to The Doe Run Resources Corporation and its predecessors, agents, and partners.

246.    The Doe Run Resources Corporation is liable for the acts and omissions of its predecessors, agents and partners from 1967 to the last date any of the referenced personal injury claims were settled and the last date LOC leaked from railcars onto BNSF's ballast and right-of-way.

247.    The non-employee claimants allegedly exposed to LOC at Cherryville contend that they inhaled and ingested air-borne LOC dust at Cherryville Siding and ingested LOC dust from hand-to-mouth contact after their arms, hands, faces, hair, and clothing became contaminated with LOC dust from BNSF's railcars at Cherryville Siding and that such inhalation and ingestion of LOC dust caused them to become lead poisoned, which resulted in personal injury to them.

248.    Mining company failed to comply with the following federal regulations relating to the loading, unloading or handling of dangerous articles:

      a.    30 C.F.R. §§ 57.5001, 57.5002, and 57.5005, which required mining company to keep air-borne lead dust below specified levels at the load out areas and track scales at Viburnum Mine/Mill, Buick Mine/Mill, and Fletcher Transload.

      b.    30 C.F.R. § 57.5003, which required mining company to keep work areas clean and orderly.

c.    30 C.F.R. § 57.9202, which required mining company to load mobile equipment (i.e. front end loaders) used for the haulage of mine material to minimize spillage where a hazard to a person could be created.

d.    29 C.F.R. § 1910.1025, which required mining company to keep air-borne lead dust below specified levels at the unloading station and track scale at Buick Smelter.

e.    49 C.F.R. §§ 171.8, 171.10, 172.101, 173.22, 173.24, 173.240, which required mining company to load LOC into leak-proof, sift-proof railcars, for shipment.

f.    49 C.F.R. §§ 172.200(a), 172.202(a)(2), 172.203(c)(1a), and 173.29, which required mining company to provide shipping papers to the railroad identifying the railcars as containing hazardous material when significant quantities of LOC remained in the cars after the cars were unloaded at Herculaneum Smelter;

g.    49 C.F.R. §§ 172.203(m)(1), 172.204(a)(1), 172.500(a), 172.504(a), 172.508, 172.554, 173.22(a)(1), and 173.1132, which required mining company to classify and/or describe LOC as a "poison" in shipping papers and railcar placards based on information known to mining company that LOC was "so toxic to humans as to afford a hazard to health during transportation."

h.    49 C.F.R. §§ 172.101, 173.22(a)(2), 173.24(c) & (e), 173.132, and 173.240 - 173.242, which required mining company to select a closed package for shipping LOC based on information known to mining company that LOC was "so toxic to humans as to afford a hazard to health during transportation."

249.    BNSF's liability to non-employee claimants allegedly exposed to LOC at Cherryville arose in part from mining company's failure to comply with the aforesaid regulations relating to the loading, unloading, and handling of dangerous articles, which caused BNSF's railroad equipment to become covered with lead dust while at the load out area at Viburnum Mine/Mill, Buick Mine/Mill, and Fletcher Transload, and the unloading station and track scale at Buick Smelter, and while in transit.

250.    BNSF's liability to non-employee claimants allegedly exposed to LOC at Cherryville arose in part from mining company's failure to comply with the aforesaid regulations relating to the loading, unloading, and handling of dangerous articles, which resulted in BNSF unknowingly setting out cars for cleaning at Cherryville that contained significant amounts of LOC and failing to take precautions against the hazards of LOC.

251.    BNSF's liability to the non-employee claimants allegedly exposed to LOC at Cherryville arose from mining company's use and operation of the track scales at Viburnum Mine/Mill, Buick Mine/Mill, and Buick Smelter, which caused BNSF's railroad equipment to become covered with LOC dust.

252.    When the aforesaid railcars arrived at Cherryville Siding for car cleaning, the cars were still covered with LOC dust.

253.    At Cherryville Siding, the employees of the car cleaning contractors climbed onto the cars in the process of cleaning the cars and in this manner came into contact with the sides, edges, ladders, steps, grab irons, handholds, handbrakes, pin pullers, couplers, air hoses, angle cocks, and other parts and appliances of the railcars and got LOC dust onto their arms, hands and clothing.

254.    The non-employee claimants allegedly exposed to LOC at Cherryville contend, among other things, that they ingested LOC dust from hand-to-mouth contact after their arms, hands, faces, hair and clothing became contaminated with LOC dust from BNSF's railcars at Cherryville Siding and that such ingestion of LOC dust caused them to become lead poisoned, which resulted in personal injury to them.

255.    The claims of the non-employee claimants allegedly exposed to LOC at Cherryville arose from mining company's failure to comply with "regulations issued by . . . [a] lawful authority . . . governing the . . . handling of dangerous articles as defined in said . . . regulations" and, therefore, fall within the scope of the indemnity provisions of ¶8 of the 1968 Buick Mine/Mill Sidetrack Agreement and ¶8 of the Buick Smelter Unloading Station Sidetrack Agreement.

256.    The claims of the non-employee claimants allegedly exposed to LOC at Cherryville were caused "in whole or in part, by an unhealthful, hazardous, or dangerous condition, caused by, contributed to, or aggravated by [mining company's] presence on and use of the premises or [mining company's] violation of "regulations . . . pertaining to . . . hazardous materials" and, therefore, fall within the scope of the indemnity provisions of ¶9 of the 1991 Fletcher Transload Lease.

257.    The claims of the non-employee claimants allegedly exposed to LOC at Cherryville arose from mining company's use of the track scales at Buick Mine/Mill and/or Buick Smelter and, therefore, fall within the scope of the indemnity provisions of ¶10 of the 1968 Buick Smelter Unloading Station Sidetrack Agreement and ¶3 of the 1973 Supplement to the 1968 Buick Mine/Mill Sidetrack Agreement.

258.    The LOC to which the claimants were allegedly exposed at Cherryville was hauled to Cherryville Siding in railcars that were subject to the 1991 Car Lease Agreement and, therefore, such claims fall within the scope of the indemnity provisions of ¶5 of the 1991 Car Lease Agreement.

WHEREFORE, BNSF prays this Court enter judgment in favor of BNSF and against The Doe Run Resources Corporation on Count I of Plaintiff's Petition for contractual indemnity with respect to the claims of the non-employee claimants allegedly exposed to LOC at Cherryville, and award BNSF damages, including recovery of its legal fees and expenses incurred in defending the underlying personal injury claims, in an amount that exceeds the jurisdictional amount of this court, plus court costs and prejudgment interest and such other relief to which BNSF may be entitled under the circumstances.

## COUNT II
### (The Doe Run Resources Corporation – Non-Employee Claimants Allegedly Exposed to LOC at Cherryville – Contribution)

259.    BNSF adopts and incorporates herein by reference the allegations of paragraphs 244 through 246 of this Petition.

260.    The non-employee claimants allegedly exposed to LOC at Cherryville contend that they inhaled and ingested air-borne LOC dust at Cherryville Siding and ingested LOC dust from hand-to-mouth contact after their arms, hands, faces, hair, and clothing became contaminated with LOC dust from BNSF's railcars at Cherryville Siding and that such inhalation and ingestion of LOC dust caused them to become lead poisoned, which resulted in personal injury to them.

261.    As hereinafter alleged in more specific detail, mining company bears joint liability with BNSF for the claims of the non-employee claimants allegedly exposed to LOC at Cherryville based on negligence, negligence per se, and products liability.

262.    Mining company is liable to the non-employee claimants allegedly exposed to LOC at Cherryville based on negligence for:

      a.    Failing to remove all LOC from the railcars when unloading the cars at Herculaneum Smelter.

      b.    Failing to inspect the railcars after the cars were unloaded at Herculaneum Smelter to make sure the cars were empty before releasing the cars back to the railroad.

      c.    Failing to warn BNSF that the railcars contained significant quantities of LOC after the cars were unloaded at Herculaneum Smelter.

      d.    Failing to take precautions to prevent spillage of LOC onto the ground during unloading of the railcars at Herculaneum Smelter.

      e.    Failing to take precautions at the unloading station at Herculaneum Smelter to suppress air-borne LOC dust by cleaning up spilled LOC and regularly sprinkling the ground with water in the vicinity of the unloading station to prevent spilled LOC from drying out.

      f.    Failing to regularly monitor for excessive amounts of LOC dust in the air at the unloading station at Herculaneum Smelter.

      g.    Failing to take precautions to prevent spillage of LOC onto the ground in the loadout areas at Viburnum Mine/Mill and Buick Mine/Mill during

the process of loading LOC into railcars from storage piles using front-end loaders.

h.      Failing to take precautions at the load out areas at Viburnum Mine/Mill and Buick Mine/Mill to suppress air-borne LOC dust by cleaning up spilled LOC and regularly sprinkling the ground with water in the load out areas to prevent spilled LOC from drying out.

i.      Failing to regularly monitor for excessive amounts of LOC dust in the air at the load out areas at Viburnum Mine/Mill and Buick Mine/Mill.

j.      Failing to take precautions to prevent spillage of LOC onto the ground during weighing and load adjusting of railcars at the track scales at Viburnum Mine/Mill, Buick Mine/Mill and Buick Smelter.

k.      Failing to take precautions at the track scales at Viburnum Mine/Mill, Buick Mine/Mill, and Buick Smelter to suppress air-borne LOC dust by cleaning up spilled LOC in the vicinity of the track scales and regularly sprinkling the ground with water in the area of the track scales to prevent spilled LOC from drying out.

l.      Failing to regularly monitor for excessive amounts of LOC dust in the air at the track scales at Viburnum Mine/Mill, Buick Mine/Mill, and Buick Smelter.

m.      Failing to take precautions to prevent spillage of LOC onto the ground during loading of railcars using the overhead crane in the load out area at Fletcher Transload.

n.    Failing to take precautions at the load out area at Fletcher Transload to suppress air-borne LOC dust by cleaning up spilled LOC and regularly sprinkling the ground with water in the load out area to prevent spilled LOC from drying out.

o.    Failing to regularly monitor for excessive amounts of LOC dust in the air at the load out area at Fletcher Transload.

p.    Failing to take precautions at the unloading shed at Buick Smelter to suppress air-borne LOC dust by cleaning up dried-out LOC in the storage bins beneath the unloading shed and regularly sprinkling the ground with water in the storage bins to prevent residual LOC from drying out.

q.    Failing to regularly monitor for excessive amounts of LOC dust in the air at the unloading shed at Buick Smelter.

r.    Failing to cover open-top railcars loaded with LOC or to spray a "binder" on the LOC to keep the LOC from blowing out the tops of the railcars.

s.    Failing to provide BNSF with the results of mining company's blood lead testing of mining company's employees who worked around LOC.

t.    Failing to warn BNSF of the dangers of inhaling or ingesting LOC or the potential of ingesting harmful levels of LOC from hand-to-mouth contact when mining company knew of such danger based on blood lead data it had collected over the course of many years of testing its own employees who worked around LOC.

u.    Failing to warn BNSF's car cleaning contractors at Cherryville of the dangers of inhaling or ingesting LOC or the potential of ingesting harmful

levels of LOC from hand-to-mouth contact when mining company knew of such danger based on blood lead data it had collected over the course of many years of testing its own employees who worked around LOC.

      v.    Failing to warn employees of BNSF's car cleaning contractors at Cherryville of the dangers of inhaling or ingesting LOC or the potential of ingesting harmful levels of LOC from hand-to-mouth contact when mining company knew of such danger based on blood lead data it had collected over the course of many years of testing its own employees who worked around LOC. •

      w.    Failing to classify and handle LOC as a "poison" for shipping purposes under U.S.D.O.T. Hazardous Materials regulations when mining company knew or should have known that LOC was "so toxic to humans as to afford a hazard to health during transportation."

263.    Mining company is liable to the non-employee claimants allegedly exposed to LOC at Cherryville based on negligence per se for failing to comply with the following regulations:

      a.    30 C.F.R. §§ 57.5001, 57.5002, and 57.5005, which required mining company to keep air-borne lead dust below specified levels at the load out areas and track scales at Viburnum Mine/Mill, Buick Mine/Mill, and Fletcher Transload.

      b.    30 C.F.R. § 57.5003, which required mining company to keep work areas clean and orderly.

c.    30 C.F.R. § 57.9202, which required mining company to load

mobile equipment used (i.e. front end loaders) for the haulage of mine material to

minimize spillage where a hazard to a person could be created.

d.    29 C.F.R. § 1910.1025, which required mining company to keep

air-borne lead dust below specified levels at the unloading station at Herculaneum

Smelter and the unloading station and track scale at Buick Smelter.

e.    49 C.F.R. §§ 171.8, 171.10, 172.101, 173.22, 173.24 and 173.240,

which required mining company to load LOC into leak-proof, sift-proof railcars,

for shipment.

f.    49 C.F.R. §§ 172.200(a), 172.202(a)(2), 172.203(c)(1a), and

173.29, which required mining company to provide shipping papers to the

railroad identifying the railcars as containing hazardous material when significant

quantities of LOC remained in the cars after the cars were unloaded at

Herculaneum Smelter;

g.    49 C.F.R. §§ 172.203(m)(1), 172.204(a)(1), 172.500(a),

172.504(a), 172.508, 172.554, 173.22(a)(1), and 173.1132, which required mining

company to classify and/or describe LOC as a "poison" in shipping papers and

railcar placards based on information known to mining company that LOC was

"so toxic to humans as to afford a hazard to health during transportation."

h.    49 C.F.R. §§ 172.101, 173.22(a)(2), 173.24(c) & (e), 173.132, and

173.240 - 173.242, which required mining company to select a closed package for

shipping LOC based on information known to mining company that LOC was "so

toxic to humans as to afford a hazard to health during transportation."

264.    As a result of mining company's failure to comply with the aforesaid regulations relating to the loading, unloading, and handling of dangerous articles, the railcars BNSF set out at Cherryville Siding for cleaning were covered with LOC dust and contained significant amounts of LOC.

265.    Lead mining company's failure to comply with the aforesaid regulations relating to the loading, unloading, and handling of dangerous articles deprived BNSF of information it needed to warn the car cleaning contractors that the railcars contained a "poison."

266.    Mining company is liable to the non-employee claimants allegedly exposed to LOC at Cherryville based on strict liability in tort for:

    a.    Placing an unreasonably dangerous and defective product, LOC, into the stream of commerce.

    b.    Failing to warn of the inherently dangerous characteristics of a product, LOC, that it placed into the stream of commerce.

267.    The aforesaid negligence of mining company and/or the defective condition and inherently dangerous characteristics of LOC caused or contributed to cause the injuries claimed by the non-employee claimants allegedly exposed to LOC at Cherryville.

WHEREFORE, BNSF prays this Court enter judgment in favor of BNSF and against The Doe Run Resources Corporation on Count II of Plaintiff's Petition for contribution with respect to the claims of the non-employee claimants allegedly exposed to LOC at Cherryville, and award BNSF damages in an amount that exceeds the

jurisdictional amount of this court, plus court costs and prejudgment interest and such

other relief to which BNSF may be entitled under the circumstances.

## COUNT III

**(The Doe Run Resources Corporation – Non-Employee Claimants Allegedly Exposed to LOC at Locations Other Than Cherryville - Contractual Indemnity)**

268.    BNSF adopts and incorporates herein by reference the allegations of

paragraphs 244 through 246 of this Petition.

269.    The non-employee claimants allegedly exposed to LOC at locations other

than Cherryville contend that they inhaled and ingested air-borne LOC dust from the

LOC-contaminated debris that was removed from railcars at Cherryville Siding and

deposited at various locations in Crawford County as hereinbefore alleged and that they

ingested LOC dust from hand-to-mouth contact after their arms, hands, faces, hair, and

clothing became contaminated with LOC dust from said deposits of LOC-contaminated

debris and that such inhalation and ingestion caused them to become lead-poisoned,

which resulted in personal injury to them.

270.    Mining company failed to comply with the following federal regulations

relating to the loading, unloading or handling of dangerous articles:

a.    49 C.F.R. §§ 172.200(a), 172.202(a)(2), 172.203(c)(1a), and

173.29, which required mining company to provide shipping papers to the

railroad identifying the railcars as containing hazardous material when significant

quantities of LOC remained in the cars after the cars were unloaded at

Herculaneum Smelter.

b.    49 C.F.R. §§ 172.203(m)(1), 172.204(a)(1), 172.500(a),

172.504(a), 172.508, 172.554, 173.22(a)(1), and 173.1132, which required mining

company to classify and/or describe LOC as a "poison" in shipping papers and

railcar placards based on information known to mining company that LOC was "so toxic to humans as to afford a hazard to health during transportation."

271.   BNSF's liability to non-employee claimants allegedly exposed to LOC at locations other than Cherryville arose in part from mining company's failure to comply with the aforesaid regulations relating to the loading, unloading, and handling of dangerous articles, which resulted in BNSF unknowingly setting out cars for cleaning at Cherryville that contained significant amounts of LOC and failing to take precautions against the hazards posed by LOC.

272.   The claims of the non-employee claimants allegedly exposed to LOC at locations other than Cherryville arose from mining company's failure to comply with "regulations issued by . . . [a] lawful authority . . . governing the . . . handling of dangerous articles as defined in said . . . regulations" and, therefore, fall within the scope of the indemnity provisions of ¶8 of the 1968 Buick Mine/Mill Sidetrack Agreement and ¶8 of the Buick Smelter Unloading Station Sidetrack Agreement.

273.   The claims of the non-employee claimants allegedly exposed to LOC at locations other than Cherryville were caused "in whole or in part, by an unhealthful, hazardous, or dangerous condition, caused by, contributed to, or aggravated by [mining company's] presence on and use of the premises or [mining company's] violation of "regulations . . . pertaining to . . . hazardous materials" and, therefore, fall within the scope of the indemnity provisions of ¶9 of the 1991 Fletcher Transload Lease.

274.   The LOC to which the claimants were allegedly exposed at locations other than Cherryville Siding was hauled to Cherryville Siding in railcars that were subject to

the 1991 Car Lease and, therefore, such claims fall within the scope of the indemnity provisions of ¶5 of the 1991 Car Lease Agreement.

WHEREFORE, BNSF prays this Court enter judgment in favor of BNSF and against The Doe Run Resources Corporation on Count III of Plaintiff's Petition for contractual indemnity with respect to the claims of the non-employee claimants allegedly exposed to LOC at locations other than Cherryville, and award BNSF damages, including recovery of its legal fees and expenses incurred in defending the underlying personal injury claims, in an amount that exceeds the jurisdictional amount of this court, plus court costs and prejudgment interest and such other relief to which BNSF may be entitled under the circumstances.

### COUNT IV
**(The Doe Run Resources Corporation – Non-Employee Claimants Allegedly Exposed to LOC at Locations Other Than Cherryville - Contribution)**

275.    BNSF adopts and incorporates herein by reference the allegations of paragraphs 244 through 246 of this Petition.

276.    The non-employee claimants allegedly exposed to LOC at locations other than Cherryville contend that they inhaled and ingested air-borne LOC dust from the LOC-contaminated debris that was removed from railcars at Cherryville Siding and deposited at various locations in Crawford County as hereinbefore alleged and that they ingested LOC dust from hand-to-mouth contact after their arms, hands, faces, hair, and clothing became contaminated with LOC dust from said deposits of LOC-contaminated debris and that such inhalation and ingestion caused them to become lead poisoned, which resulted in personal injury to them.

277.    As hereinafter alleged in more specific detail, mining company bears joint liability with BNSF for the claims of the non-employee claimants allegedly exposed to

2415236                    65